In re LATIN INVESTMENT
CORPORATION,
Debtor.

Murray DRABKIN, Trustee of the
Estate of Latin Investment
Corporation, Plaintiff,

v.

L & L CONSTRUCTION ASSOCIATES,
INC., et al., Defendants.

Bankruptcy No. 90–01046.
Adv. No. 91–0084.

United States Bankruptcy Court,
District of Columbia.

Aug. 17, 1993.

Steven P. Hollman, Hogan & Hartson, Washington, DC, for plaintiff.

Bradshaw Rost, Washington, DC, for defendants.

*DECISION RE STANDING OF TRUSTEE TO PURSUE CONSPIRACY AND AIDING AND ABETTING CLAIMS SET FORTH IN COUNTS 8 AND 9 OF THE AMENDED COMPLAINT*

S. MARTIN TEEL, Jr., Bankruptcy Judge.

This matter concerns whether the trustee, Murray Drabkin, of the estate of the debtor, Latin Investment Corporation, has standing to raise counts 8 and 9 of the amended complaint. Those counts charge the defendants, L & L Construction Associates, Inc., L & L Partnership, and Manuel Leiva, with conspiracy and aiding and abetting conspiracy and fraud. As alleged, the wrongdoing arises out of defendants' role in bringing about the demise of the debtor. According to the trustee, counts 8 and 9 focus on how defendants participated in and helped the debtor's principals breach duties owed to the debtor and by so doing caused its ruin. Defendants take issue with the trustee's portrayal of counts 8 and 9. They urge that what the trustee really wants to do is recover for injuries done to a discrete class of the debtor's creditors, those persons who deposited funds with the debtor. Because the claims arising from these injuries belong to the individual depositors, and not to the debtor, defendants reason, the trustee lacks standing to pursue them. The court believes that the gravamen of counts 8 and 9 relates to harm done to the debtor distinct from that inflicted on the depositors. At state law, the debtor would be able to seek redress for such harm. As the successor to the debtor's rights, the trustee has standing to bring counts 8 and 9.

*FACTS* [1]

The debtor was incorporated in the District of Columbia in May 1983 to provide banking services. Its directors, officers and shareholders were Juan Alvarado, Jose A. Cortes, Fernando Leonzo, and Leonel Salinas (collectively "the debtor's principals"). At all relevant times, these individuals remained as the debtor's principals. The vast majority of the debtor's 3000 depositors were recent immigrants from Latin American, most of whom had roots in El Salvador.

The debtor lent, invested or otherwise disposed of monies deposited while purporting to maintain deposit accounts for the depositors. Much of the money the debtor loaned or invested went to entities in which its principals had a financial interest.

Defendant L & L Construction, Inc. was incorporated in the District of Columbia in February 1985. It is a concrete construction and site development company. Its original officers, directors and shareholders were defendant Manuel Leiva and the debtor's principals. For capital, it relied on loans from the debtor.

Beginning in April 1986 and ending in October 1990, shares were redeemed and transferred among the L & L Construction shareholders as well as to William Lopez Garces and his daughter Gladys V. Leiva, who is also the wife of Manuel Leiva. The net result was that as of October 1990, the officers, directors and shareholders of L & L Construction were Manuel Leiva, Gladys V. Leiva and William Lopez Garces.

Defendant L & L Partnership is a Maryland general partnership created in November 1987. It served as a vehicle for making investments for its general partners, who were identical to the principals of L & L Construction—that is, Manuel Leiva and the debtor's principals. Like L & L Construction, it relied on the debtor for funding.

As with L & L Construction, the general partners of L & L Partnership changed to Manuel Leiva, Gladys V. Leiva, and William Lopez Garces. This change was brought about through a series of transactions taking place in 1990.

On November 29, 1990, the debtor ceased operations. An involuntary petition under

---

**1.** Because in evaluating a motion to dismiss the material facts alleged in the complaint must be accepted as true, *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206–07, 45 L.Ed.2d 343 (1975), this rendition of the facts is taken from the trustee's amended complaint but is intended to be binding only for purposes of this decision.

chapter 7 was filed against the debtor on December 12, 1990. On April 14, 1991, the case was converted to chapter 11 and then immediately back to chapter 7.

### COUNTS 8 AND 9

In count 8, which is for conspiracy, the trustee makes the following allegations. Defendants were aware of how the debtor conducted business, and in particular, how it solicited funds in the Latino community. (¶¶ 82–83.[2]) Defendants realized that the debtor had access to vast financial resources through its deposit accounts. (¶ 82.)

Manuel Leiva and the debtor's principals created L & L Construction and L & L Partnership (collectively "the L & L entities") as vehicles to obtain access to the debtor's funds and convert those funds to their own use. (¶¶ 84, 92.) When Leiva and the debtor's principals created the L & L entities, they intended for the debtor to fund both entities' initial operations and for L & L Partnership's activities to be wholly funded by the debtor. (¶¶ 86–87.)

In exchange for their efforts, the debtor's principals were made owners and principals in both L & L entities. (¶ 85.) To conceal the debtor's connections with the L & L entities, the debtor's principals held these positions in their own names, rather than in the debtor's name. (¶ 88.)

The debtor's principals, with defendants' knowledge, support and assistance, solicited and received funds from depositors. (¶ 90.) Defendants and the debtor's principals intended to use, and did in fact use, the funds deposited to make loans and payments to the L & L entities and their principals. (¶ 90.) In addition, loans were made for the personal use of the principals of the L & L entities and their relatives. (¶¶ 90, 92.)

These exceptionally risky loans were made without arms-length negotiation. (¶ 91.) Most of them were made without adequate documentation, collateral, or terms of repayment. (¶ 91.) Collection efforts were lax to begin with while what efforts were made were thwarted by defendants. (¶ 91.) Many loans were simply forgiven. (¶ 91.)

Defendants and the debtor's principals worked a classic pyramid scheme to keep the debtor operating despite its insolvency and shortage of cash. (¶ 93). The debtor's principals made intentional misrepresentations in soliciting funds from depositors, misused and dissipated the funds deposited, and paid off depositors with funds deposited by new depositors. (¶ 93.) Defendants participated in this scheme by providing capital and kiting checks to meet the withdrawal demands of depositors. (¶ 93.) When checks were kited, the debtor's principals used depositors' checks to reimburse defendants. (¶ 93.)

By working together to perpetuate the existence of the debtor, defendants and the debtor's principals caused the debtor to incur substantial additional obligations to depositors. (¶ 93.) This scheme resulted in hundreds of depositors losing money. (¶ 93.)

These acts to further the conspiracy were committed from 1985 to 1990. (¶ 94.) The conspiracy caused the debtor to suffer depletion of funds amounting to over $6,461,266.91. (¶ 95.)

In count 9, which is for aiding and abetting conspiracy and fraud, the trustee makes the following allegations. The debtor's principals conspired to violate their fiduciary obligations to the debtor. (¶ 97.) The violations consisted of soliciting funds under false pretenses, in particular, promising the funds would be secure and safe and prevailing commercial standards would be adhered to. (¶ 97.) In addition, the debtor's principals engaged in self-dealing, made high-risk self-interested loans and advances, and failed properly to record many of the loans, to obtain adequate collateral for the loans, and to collect overdue loans. (¶ 97.)

Defendants knew of the debtor's principals' conduct, and supported and assisted the debtor's principals in breaching their fiduciary duties to the debtor. (¶ 97.) In conjunction with this conduct, defendants engaged in the conduct described in count 8. (¶ 98.) Through these means, defendants knowingly and substantially assisted the breaches of fiduciary duty and fraudulent conduct of the

**2.** Paragraph references are to paragraphs as numbered in the amended complaint.

debtor's principals. (¶ 98.) In so assisting and aiding and abetting the debtor's principals, defendants caused the debtor to suffer damages of more than $6,461,266.91. (¶ 99.)

## PARTIES' CONTENTIONS

Defendants believe that counts 8 and 9 should be dismissed for lack of standing. They reason that this case cannot be meaningfully distinguished from *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972), where under the old Bankruptcy Act the Court held that a trustee lacked standing to bring a damage action on behalf of bondholders against the agent charged with protecting their interests. According to defendants, both conspiracy and aiding and abetting require underlying wrongful conduct. *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C.Cir. 1983). In this case, defendants observe, that conduct consists of defrauding the depositors of over $6.5 million. Once the underlying conduct is identified, defendants reason, it is clear that *Caplin* controls the outcome of this case. Defendants emphasize that as was the case in *Caplin,* outside of bankruptcy, the debtor would not have a claim against defendants with whom the debtor is *in pari delicto.* Lastly, defendants argue that the trustee's suit is fraught with the possibility of depositors' interests conflicting with those of the trustee in addition to inconsistent results should the depositors bring their own actions against defendants.

The trustee maintains he has standing to bring this suit as the representative of the debtor's estate. He distinguishes the cases relied on by defendants as involving the trustee's improper attempts to assert specific causes of action that clearly ran in favor of individual creditors. In contrast, counts 8 and 9, the trustee avers, set forth causes of action belonging only to the debtor. According to the trustee, both counts focus on defendants' participation, both directly and as facilitator, in the debtor's principals' breach of fiduciary duties to the debtor. More specifically, the trustee characterizes the breaches as mismanagement of the debtor and misuse of its funds.

Both parties have set forth their version of the "unifying theme" of counts 8 and 9. The trustee states, "The unifying theme of the allegations of Counts Eight and Nine is that defendants assisted [the debtor's] officers and directors in mismanaging and misusing the assets of the Corporation." (Opp'n Mot. Dismiss, at 5–6.) Defendants counter, "The unifying theme of Counts Eight and Nine is the allegation that Defendants either conspired with or substantially assisted in a scheme to obtain money from the depositors by the use of false and fraudulent misrepresentations." (Reply Supp. Mot. Dismiss, at 3–4.)

## DISCUSSION

■ The trustee succeeds to the property of the debtor's estate. *See* 11 U.S.C. §§ 704(1), 541(a)(1). This property includes all causes of action the debtor could have brought outside bankruptcy. Among these causes of action are suits arising from breaches of fiduciary duty by the corporate debtor's principals that could have been brought directly by the debtor or indirectly through shareholder derivative suits. *Pepper v. Litton,* 308 U.S. 295, 307, 60 S.Ct. 238, 245–46, 84 L.Ed. 281 (1939); *Delgado Oil Co. v. Torres,* 785 F.2d 857, 860 (10th Cir.1986). But the trustee cannot allege causes of action belonging to individual creditors. *Caplin,* 406 U.S. at 434, 92 S.Ct. at 1688. Thus, at issue here is whether at state law the debtor could have brought counts 8 and 9 against the defendants or whether the causes of action alleged in those counts belong to individual creditors.

■ The court agrees with defendants that both conspiracy and aiding and abetting claims require underlying wrongful conduct and that the first step in analyzing the trustee's standing to bring counts 8 and 9 is to identify the underlying wrongful conduct he proposes to sue on. The trustee maintains counts 8 and 9 arise out of mismanagement of the corporation and misuse of corporate assets; defendants say they are bottomed on fraud on the individual investors.

The court believes that what is really at issue in counts 8 and 9 is fraud against the corporation. This is hard to discern from the

amended complaint because in counts 8 and 9 the trustee never comes right out and labels the underlying conduct as fraud, but instead recites at length the wrongful conduct of the debtor's principals and defendants. But in his pleadings the trustee identifies the underlying conduct as mismanagement of the debtor and misuse of corporate funds. He seeks to hold defendants liable for participating and assisting the debtor's principals in this misconduct, which under the law of corporations constitutes breaches of fiduciary duty.

■ As alleged by the trustee in counts 8 and 9, there are two aspects to corporate mismanagement and misuse of corporate funds—that is, negligent and intentional fraudulent mismanagement and misuse of funds. To the extent the trustee seeks recovery for the debtor's principals negligence in mismanaging the debtor and misusing corporate funds, no viable cause of action lies. Negligence involves a breach of duty of care. Because defendants were not principals of the debtor, they owed it no duty of care and therefore cannot be held liable for damages for their role in any negligent breaches of fiduciary duty by debtor's principals.

However, contrary to defendants' assertions, the trustee has alleged a viable cause of action to the extent intentional mismanagement and misuse of funds allowed, or was intended to allow, defendants and the debtor's principals collectively to loot the corporation of its assets, in this case, the funds deposited by the investors. *See* 3A William A. Fletcher, *Fletcher Cyclopedia on the Law of Private Corporations* § 1102, at 168 (perm. ed. rev. vol. 1986). Any damages capable of proof flowing from efforts to further this end are compensable. These would include damages from the looting itself as well as damages inflicted in perpetuating the debtor's existence past the point of insolvency in order to loot. (Proof of damages to any degree of certainty seems to pose serious problems here but should not in itself affect the decision as to standing.) In other words, the trustee has standing to sue defendants for any damages caused by their participation as co-conspirators or as aiders and abettors in the debtor's principals' fraudulent, as opposed to negligent, breaches of fiduciary duty to the debtor.

■ Defendants are correct in asserting that the debtor, through its principals, aggrandized itself by fraudulently inducing the depositors to place their money with the debtor. If the trustee's causes of action were premised on this conduct, he would be unable to maintain them. Because the principals were stealing for the benefit of the debtor, their conduct would be imputed to the debtor, which would be estopped from suing other participants in the fraud. *See Cenco, Inc. v. Seidman & Seidman,* 686 F.2d 449 (7th Cir.), *cert. denied,* 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982); *Security Am. Corp. v. Schacht,* No. 82–C–2132 (N.D.Ill. January 31, 1983) (LEXIS, Genfed library, Dist. file).

But what the trustee is suing on, is what happened after the monies were deposited. This involved theft from, and looting of, the debtor. It did not benefit the debtor in any way, but only defendants and the debtor's principals. As in *Schacht v. Brown,* 711 F.2d 1343 (7th Cir.), *cert. denied,* 464 U.S. 1002, 104 S.Ct. 508, 78 L.Ed.2d 698 (1983)—

> [Counts 8 and 9] allege[ ] a far-reaching scheme in which, as a consequence of the illegal activities of [the debtor's principals] and the outside defendants, [the debtor] was, *inter alia,* fraudulently continued in business past its point of insolvency and systematically looted of its [assets]—all actions which aggravated [the debtor's] insolvency. In no way can these results be described as beneficial to [the debtor].

*Id.* at 1347–48 (citation and footnote omitted); *accord In re Investors Funding Corp.,* 523 F.Supp. 533, 540–41, 545 (S.D.N.Y.1980). In these circumstances, where the corporation is not aggrandized but looted, there is no basis for imputing the wrongful conduct of the corporate principals to the corporation. *Id.; Tew v. Chase Manhattan Bank, N.A.,* 728 F.Supp. 1551, 1559–61 (S.D.Fla.1990); *Investors Funding,* 523 F.Supp. at 540–41, 545; *In re Ahead by a Length,* 100 B.R. 157, 168–169 (Bankr.S.D.N.Y.1989); *cf. FDIC v. O'Melveny & Meyers,* 969 F.2d 744, 750 (9th Cir. 1992) (federal receiver case).

It is no defense to say that the debtor is estopped because not only its principals but also its owners (who were the principals) participated in the fraud. It is a fundamental precept of corporation law that the corporation is a entity separate from its shareholders. *E.g., Ahead by a Length,* 100 B.R. at 169. More importantly, once a chapter 7 trustee is appointed, the trustee takes over ownership of the corporate debtor for the benefit of all creditors. *Cf. In re Fairchild Aircraft Corp.,* 128 B.R. 976, 981 (Bankr. W.D.Tex.1991) (chapter 11 case). Any policy reasons outside bankruptcy for taking pains to bar shareholders from recovery, including imputing their knowledge to the corporation, do not support limiting the ability of a trustee in bankruptcy to liquidate the debtor's assets.

Absent from this case are the policy concerns present in cases like *Caplin* or *Cenco.* First, it should be noted that the shareholders did not benefit from the fraud as shareholders. To the contrary, their fraud on the debtor rendered their ownership interest worthless. Moreover, there is no possibility in this case of shareholders receiving any distribution from the estate. This alleviates any concern of the suit facilitating a "perverse" compensation scheme at odds with one of two underlying objectives of tort liability, that of compensating victims of wrongdoing. *See Schacht,* 711 F.2d at 1348; *compare Cenco,* 686 F.2d at 455. In addition, there is no danger of a double recovery by those actually injured. None of the individual investors have filed suit against defendants, *compare Cenco,* 686 F.2d at 455, and if they did, their damages would necessarily be reduced by any distribution from the debtor's estate. From the standpoint of the other objective of tort liability, that of deterring wrongdoing, allowing this suit to go forward will not encourage the perpetration of fraud of this nature by facilitating recoveries for fraudfeasors. *Schacht,* 711 F.2d at 1349; *compare Cenco,* 686 F.2d at 455–56. The factor of encouraging innocent shareholders to police the debtor's management is, of course, not present. *Id.* This suit will further the goal of deterrence by discouraging third-parties, such as defendants, from participating in schemes to defraud another.

*Tew,* 728 F.Supp. at 1560. Because the trustee is suing defendants on behalf of the debtor, and not creditors, there is no danger of defendants becoming subrogated to the rights of creditors against the debtor. *Compare Caplin,* 406 U.S. at 430, 92 S.Ct. at 1686. Finally, inconsistent litigation results are no real threat because the trustee's causes of action arise out of conduct distinct from that injuring individual creditors. *Compare id.* at 431–32, 92 S.Ct. at 1686–87. The only effect of a recovery here will be to limit the amount individual investors can recover if successful in a suit against defendants.

■ Defendants focus on the allegations in counts 8 and 9 which suggest defendants participated, and aided and abetted the debtor's principals, in defrauding the depositors into depositing their monies in the debtor. Based on these allegations, defendants conclude, counts 8 and 9 are really directed at the fraud on the depositors and therefore give rise to claims belonging to the depositors, and not to the debtor.

To the extent these allegations are made in the hope of recovering for any damages defendants may have caused depositors, the court agrees that the trustee is without standing to sue. But to the extent these allegations relate to how defendants and the debtor's principals acted in concert to loot the debtor, the trustee has standing to seek redress for any damages the debtor suffered from this fraudulent scheme. The same applies with respect to allegations relating to how defendants and the debtor's principals worked together to perpetuate the existence of the insolvent debtor through fraudulent means with the intent of further looting it, including taking on obligations the debtor had no hope of performing. *Schacht,* 711 F.2d at 1347–48; *Investors Funding,* 523 F.Supp. at 541. In this context, the allegations simply evidence defendants' knowing participation in, and aiding and abetting of, illegal efforts to loot the debtor or to continue it in business past its point of insolvency in order to loot it. In short, the focus of counts 8 and 9 is on the concerted efforts to steal money from the debtor, rather than from the depositors.

The cases relied on by defendants are readily distinguishable. Most of them involved suits by the trustee solely on behalf of creditors. *Caplin,* 406 U.S. at 422; 92 S.Ct. at 1682; *E.F. Hutton & Co., Inc. v. Hadley,* 901 F.2d 979, 982 (11th Cir.1990); *Williams v. California 1st Bank,* 859 F.2d 664, 665 (9th Cir.1988); *In re Ozark Restaurant Equip. Co.,* 816 F.2d 1222, 1223 (8th Cir.), *cert. denied,* 484 U.S. 848, 108 S.Ct. 147, 98 L.Ed.2d 102 (1987); *In re M & L Business Mach. Co.,* 136 B.R. 271, 276 (Bankr.D.Colo. 1992); *In re D.H. Overmyer Telecasting Co.,* 56 B.R. 657, 660 (Bankr.N.D.Ohio 1986). In some of the cases cited, there was privity between the creditors and the defendants so that the defendants owed a fiduciary duty directly to the creditors. *Caplin,* 406 U.S. at 422, 92 S.Ct. at 1682; *D.H. Overmyer,* 56 B.R. at 659–60. In those cases seemingly most on point, the trustees pursued claims of behalf of creditors, focusing their respective causes of action on the parties' fraudulent conduct in pursuing a "Ponzi" scheme, rather than the fraudulent conduct peculiar to stealing from the debtor. *M & L,* 136 B.R. at 274; *Feltman v. Prudential Bache Sec.,* 122 B.R. 466, 469 (S.D.Fla.1990). In contrast, here the trustee pursues no claims for creditors and seeks damages for fraudulent conduct apart from the Ponzi scheme. The Ponzi scheme is implicated incidentally—that is, only so far as it allowed, or was intended to allow, further looting of the debtor.

The case most on point and most difficult to distinguish is the *Feltman* case. There, the court addressed the trustee's standing to sue as the representative of debtor corporations. 122 B.R. at 473. It found such standing lacking because, unlike the corporation in *Schacht v. Brown,* the debtor corporations were "created for the sole purpose of defrauding creditors," and as such were "sham corporations"—not just "legal fictions" but entirely "fictitious." They were "alter egos with no corporate identity separate from [their sole shareholder]" and "were essentially only conduits for stolen money." *Id.* But *see Tew,* 728 F.Supp. at 1560 (weighing the fact that a corporation was a conduit for

money as factor distinguishing case from *Cenco* ).

*Feltman* can be distinguished from this case. As the trustee points out, there is no allegation in the amended complaint that the debtor was a sham corporation or an alter ego.[3] Drawing all reasonable inferences in favor of the trustee, as is proper at this stage of the proceedings, *Warth,* 422 U.S. at 501, 95 S.Ct. at 2206–07, it is reasonable to infer from the amended complaint that the debtor performed legitimate business services for its customers and sought to invest to increase its worth. Indeed, the very fact of its 7½-year existence before "the bubble burst" confirms this. In short, on the facts as alleged, the debtor cannot be said to have been "created for the sole purpose of defrauding creditors." Thus, any damage to the debtor is not wholly illusory because the debtor is not wholly illusory. *Compare Feltman,* 122 B.R. at 475. In fact, as alleged, the instant case seems more like *Investors Funding,* where the corporation went insolvent because of bad management decisions *and* because of misappropriations, and as the fraud progressed "larger and larger amounts of money were required and were obtained" to perpetuate the debtor's existence. 523 F.Supp. at 536.

In addition, in each count alleged, the trustee in *Feltman* sued on behalf of creditors and the debtor without distinguishing in any way conduct harming the debtor from conduct harming the creditors. 122 B.R. at 469. In so doing, the trustee foreclosed any possibility of claiming with any degree of credibility that he was seeking redress of injuries peculiar to the corporate debtor. That flaw is absent from the amended complaint filed in this case.

### CONCLUSION

For the foregoing reasons, it is

ORDERED that defendants' motion to dismiss for lack of standing is denied.

---

**3.** This is not to suggest that the court takes any position with respect to the reasoning in *Feltman* that a trustee for a debtor cannot maintain a cause of action against third-parties if the debtor is a sham corporation or an alter ego of its owners.